AO 106A  (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
for the
District of New Mexico   ▼

FILED
United States District Court
Albuquerque, New Mexico

Mitchell R. Elfers
Clerk of Court

In the Matter of the Search of

*(Briefly describe the property to be searched or identify the person by name and address)*

**INFORMATION ASSOCIATED WITH JBM3893@YAHOO.COM THAT IS STORED AT PREMISES CONTROLLED BY APPLE INC.**

)
)
)
)
)
)
)

Case No.   **23mr2070**

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ **Northern** _____ District of _____ **California** _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. § 1951 | Hobbs Act extortion under color of official right |

The application is based on these facts:

The affidavit of Special Agent Andrew Waltz is incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Andrew Waltz, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
telephonically sworn and electronically signed   *(specify reliable electronic means)*.

Date:   11/02/2023

_____
*Judge's signature*

City and state:   Albuquerque, New Mexico

John F. Robbenhaar, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH AN JBM3893@YAHOO.COM THAT IS STORED AT PREMISES CONTROLLED BY APPLE INC. | Case No. _____<br><br>**Filed Under Seal** |

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Andrew Waltz, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that are stored at premises owned, maintained, controlled, or operated by Apple Inc. ("Apple"), an electronic communications service and/or remote computing service provider headquartered at One Apple Park Way, Cupertino, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Apple to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B.  Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since July 12, 2015. I have received basic law enforcement training at the FBI Academy in Quantico, Virginia. I am currently assigned to the FBI's San Juan Field Office, where I am

responsible for conducting and assisting in public corruption investigations, including related white collar and financial crimes. I have investigated public corruption matters for over eight years. My training included instruction on investigative tools and criminal law, such as the development and identification of probable cause to support the affidavits in support of applications to obtain electronic data. I have become well versed in the methodology utilized in criminal conspiracies and activities. I have arrested numerous individuals for various criminal violations and have spoken with numerous individuals regarding their criminal activities conducted and facilitated through the use of electronic data.

3. Since becoming an FBI agent, I have (a) conducted, monitored, and reviewed physical and wire surveillance, including Title III surveillance in investigations involving public corruption matters; (b) executed search warrants on Apple-linked accounts on which incriminating evidence has been found; (c) reviewed and analyzed numerous recorded conversations and other documentation of criminal activity; (d) debriefed cooperating defendants and confidential human sources; and (e) conducted other surveillance of individuals engaged in public corruption and white collar crimes. As a result of my training and experience, I am aware that public corruption and white-collar criminals frequently use electronic communications to further their criminal activities. I am also aware that such criminals often communicate using vague, guarded, or coded language when discussing their illegal activities in an effort to further prevent detection.

4. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is

2

intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

5. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. § 371 (Conspiracy) and 18 U.S.C. § 1951 (Hobbs Act extortion under color of official right) (the "TARGET OFFENSES") have been committed by Ricardo MENDEZ, Joshua MONTANO, and others both known and unknown to the government (the "TARGET SUBJECTS"). Based on the information set forth below, I believe that that there is probable cause to believe that evidence of these violations, as well as contraband, fruits of crime, or other items illegally possessed, and/or property designed for use, intended for use, or used in committing a crime, will be found within the Apple iCloud account associated with Apple ID jbm3893@yahoo.com (the "**TARGET ACCOUNT**").

**JURISDICTION**

6. This Court has jurisdiction to issue the requested warrant because it is a "court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that – has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

3

**PROBABLE CAUSE**

### I.   *Overview and Background*

7.      The United States is investigating potential violations committed by Ricardo MENDEZ, Joshua MONTANO, and others both known and unknown to the government, involving 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 1951 (Hobbs Act extortion under color of official right).

8.      For the reasons described below, there is reason to believe that Albuquerque Police Department (APD) Police Officer Joshua MONTANO, and others yet unknown, divert individuals arrested for Driving While Impaired (DWI) to Ricardo MENDEZ (a defense investigator for a criminal defense attorney in Albuquerque), and that Ricardo MENDEZ, while working in concert with Joshua MONTANO, subsequently requests cash payments from the alleged DWI offenders in exchange for the offender's charges being improperly dismissed or not filed.

### II.   *Relevant Individuals and Entities*

9.      Ricardo MENDEZ is believed to be a defense investigator/paralegal at Clear & Clear PA. According to its website, Clear & Clear PA is a criminal defense law firm founded in 1982 and located in Albuquerque, New Mexico. The website states that Clear & Clear PA is a full-service firm that regularly defends individuals against a variety of felony and misdemeanor criminal charges.

10.     Through information and belief, Ricardo MENDEZ handles client consults, pre-trial interviews, and other tasks for attorney Thomas Clear. According to the website for Clear &

Clear PA, Ricardo MENDEZ works with clients daily, keeping them posted on the status and progress of their cases. Ricardo MENDEZ is believed to be the user of (505) 980-4946, hereinafter **MENDEZ PHONE**.[1]

11.     Joshua MONTANO is a police officer with the Albuquerque Police Department. Joshua MONTANO is assigned to the DWI unit. Joshua MONTANO is believed to be the user of (505) 918-8132, hereinafter **MONTANO PHONE**.[2]

### III.     The April 2022 arrest of Witness #1 by Joshua MONTANO

12.     On or about April 29, 2022, the FBI received an allegation from an attorney who was contacted by a separate criminal defense attorney regarding the criminal defense attorney's client. The client will hereinafter be referred to as Witness #1 (W1).[3] W1 was subsequently interviewed by the FBI on October 5, 2023. Information gathered during W1's interview is summarized below:

---

[1] Ricardo MENDEZ is believed to be the user of **MENDEZ PHONE** for numerous reasons, including consensually monitored telephone calls in which Ricardo MENDEZ is using the device. According to Verizon Wireless, Ricardo MENDEZ is also the listed subscriber for **MENDEZ PHONE**.

[2] Joshua MONTANO is believed to be the user of **MONTANO PHONE** based on a review of open-source records, to include the CLEAR Law Enforcement Database. According to AT&T Wireless, Joshua MONTANO is also the listed subscriber for **MONTANO PHONE**.

[3] The FBI referred the April 29, 2022, allegation to the Albuquerque Police Department Internal Affairs on June 24, 2022.

5

13.    On or about Friday, April 22, 2022, at approximately 1:30 a.m., W1 was driving northbound on I-25. APD Police Officer Joshua MONTANO stopped W1 in the vicinity of the Comanche exit on northbound I-25.

14.    Joshua MONTANO asked W1 if W1 had been drinking. W1 denied drinking. Joshua MONTANO conducted a field sobriety test on W1. After administering the test, Joshua MONTANO advised that W1 had failed. Joshua MONTANO then arrested W1 and transported W1 to a police station in downtown Albuquerque, New Mexico.

15.    Once at the police station, an unidentified individual gave W1 a breath test. Joshua MONTANO remained present during the administration of the test.[4] The breath test result was .21, which fell in the aggravated DWI category. Either Joshua MONTANO or another officer clarified W1's identifying information. W1 did not recall exactly what identifiers W1 provided, but thought it included address, phone number, date of birth and social security account number.

16.    A transport vehicle eventually arrived to transport W1 to the Metropolitan Detention Center (MDC). W1 went to the restroom prior to loading into the transport vehicle. Joshua MONTANO escorted W1 to the restroom. While in the restroom, Joshua MONTANO told W1 that he had found the bag of mushrooms in W1's car and that W1 should feel lucky it was

---

[4] The FBI reviewed Joshua MONTANO's body camera footage. Based on that review, the FBI believes it was in fact Joshua MONTANO who administered the test.

Joshua MONTANO that found it and not someone else. Joshua MONTANO said he would not charge W1 for possession of the mushrooms. Joshua MONTANO also told W1 that when W1 got out of jail, someone would call W1 to help W1 resolve this situation. W1 did not understand what Joshua MONTANO meant. Joshua MONTANO was in police uniform during the entirety of their interactions.[5]

17.    When W1 was eventually released from custody, APD personnel returned all W1's belongings, except for W1's driver's license. W1 last recalled seeing it during the traffic stop.

18.    On or about Monday, April 25, 2022, W1 called and left messages with three or four law firms but did not speak with anyone. W1 could not remember the specific law firms.

19.    On April 25th, 2022, around 4:00 p.m. or 5:00 p.m., W1 received a telephone call from Ricardo MENDEZ. During the phone call, Ricardo MENDEZ asked W1 if W1 was interested in a free consultation. Ricardo MENDEZ told W1 that he was aware of W1's current DWI situation. W1 and Ricardo MENDEZ agreed to meet on April 27, 2022.[6] W1 indicated that

---

[5] The FBI obtained a copy Joshua MONTANO's body camera footage from April 22, 2022. The footage on the body camera was consistent with W1's description of events, however, based on a review of the footage, Joshua MONTANO appears to have removed his body camera and left it unattended during the period when W1 used the bathroom.

[6] At the time the FBI interviewed W1, W1 was no longer in possession of Ricardo MENDEZ's telephone or text messages between W1 and Ricardo MENDEZ.

W1 believed at the time that Ricardo MENDEZ was calling from one of the law firms W1 had contacted earlier in the day.

20.    On or about April 27, 2022, at approximately 12:00 p.m., W1 met with Ricardo MENDEZ at Thomas Clear's office, which was a residence located at 7112 Aztec Rd NE, Albuquerque NM 87110. W1 indicated that Thomas Clear was in and out of the room during the meeting.

21.    Upon W1's arrival, W1 observed an unidentified individual leaving Thomas Clear's office. W1 recalled Ricardo MENDEZ telling W1 that the individual who was leaving the office was on his way to an ATM to withdraw money.

22.    During the meeting, Ricardo MENDEZ told W1's DWI incident could all be made to go away and that W1 would not have to attend an arraignment. Ricardo MENDEZ told W1 that if W1 agreed to pay Ricardo MENDEZ $10,000 and plead not guilty, W1's case would all go away. Thomas Clear was in a corner of the room working on a laptop while Ricardo MENDEZ was speaking with W1. W1 had no doubt that Thomas Clear was able to hear what Ricardo MENDEZ told W1.

23.     Ricardo MENDEZ then proceeded to pull out W1's license from a shirt pocket and placed it on the desk in front of W1.[7] W1 asked Ricardo MENDEZ when W1 could get the driver's license back. Ricardo MENDEZ responded that W1 could have it back as soon W1 paid Ricardo MENDEZ. W1 told Ricardo MENDEZ that W1 did not have $10,000. In response, Ricardo MENDEZ told W1 that W1 could pay $5,000 up front and make $1,000 monthly payments until the debt was settled. Ricardo MENDEZ told W1 that W1 had until the following day to pay – that is, April 28, 2022.

24.     When W1 asked Ricardo MENDEZ about getting a second legal opinion, Ricardo MENDEZ replied that W1 was looking at felony charges for the mushrooms. W1 told Ricardo MENDEZ that W1 was never charged with the mushrooms, to which Ricardo MENDEZ and Thomas Clear then both responded in near-unison, "Not yet."[8] W1 interpreted this to imply that that if W1 did not pay Ricardo MENDEZ $10,000, W1 would be charged with a felony. Thomas

---

[7] In my training and experience I am not aware of any legitimate reason that a defense attorney's employee would be given an arrestee's identification card by the arresting officer before the arrestee had retained the services of the law firm.

[8] The FBI has reviewed the criminal complaint, police report, and "tow-in" report filed by Joshua MONTANO relating to W1's arrest on April 22, 2022. The complaint and police report make no mention of any mushrooms being found in W1's vehicle. The tow-in report indicates that mushrooms were located in a clear bag in the center console of the vehicle. Because I believe it unlikely that Ricardo MENDEZ could have received the tow-in report from the arrest through a public records request during that short time period, it leads me to believe that Ricardo MENDEZ learned of the mushrooms in W1's vehicle by speaking with Joshua MONTANO. Again, through my training and experience, I am not aware of any legitimate reason that a defense attorney's employee would be speaking with the arresting officer about evidence found in the arrestee's vehicle before the arrestee had retained the services of the law firm.

9

Clear then walked up to the chair where W1 was sitting and showed W1 a website with a list of controlled substances. Thomas Clear stated that mushrooms would fall under the category of a 4th degree felony.

25.    Ricardo MENDEZ said he was friends with Joshua MONTANO and that he obtained W1's driver's license from Joshua MONTANO. W1 believed Thomas Clear was in the room at this time but was unsure. Ricardo MENDEZ then asked W1 if W1 remembered "Josh" telling W1 that someone would call him, seemingly in reference to the conversation W1 had with Joshua MONTANO in the bathroom prior to being transported to MDC.

26.    W1 asked Ricardo MENDEZ if W1 could think about the offer. Ricardo MENDEZ told W1 that W1 needed to pay by the following day at 6:00 p.m. Ricardo MENDEZ and Thomas Clear then walked W1 out of the meeting and shook W1's hand.

27.    The next day, at approximately 6 p.m. or 7 p.m., W1 received two telephone calls and a text message from Ricardo MENDEZ. W1 did not answer the phone calls or the text message. W1 did not interact with Ricardo MENDEZ or Thomas Clear again.

28.    W1 did not pay Ricardo MENDEZ the requested $10,000 and retained a different attorney to represent W1 in W1's DWI case.

29.    W1's DWI case was dismissed about two months later due to Joshua MONTANO being involved in a serious car accident. On or about May 12, 2023, the case against W1 was re-filed. W1 took a plea agreement and has been on probation since June 29, 2023. W1's probation

ends on June 29, 2024. According to a docket obtained from the New Mexico court's system, W1 was charged for DWI, Speeding, and Failure to Maintain Traffic Lane. The Criminal Complaint was for aggravated DWI, Speeding, and Failure to Maintain Traffic Lane. The Criminal Complaint listed the arresting officer as Joshua MONTANO. W1 entered a plea of guilty for DWI. The plea agreement included a deferred sentence for the charge of DWI. Speeding and Failure to Maintain Traffic Lane were dismissed.[9]

30.     Agents reviewed Ricardo MENDEZ's phone records which revealed on April 22, 2022, at approximately 12:44 p.m., **MENDEZ PHONE** called W1's phone for 1 minute. W1 did not make mention of receiving a call from Ricardo MENDEZ on April 22, 2022, but this call occurred within 12 hours of W1's arrest. W1 recalled being released from jail around 5 p.m. on April 22, 2022. A review of the toll records from for **MENDEZ PHONE** on April 22, 2022, do not show any incoming calls from W1 to **MENDEZ PHONE** on that day before MENDEZ PHONE attempted to call W1 at 12:44 p.m. On April 25, 2022, at approximately 4:55 p.m., **MENDEZ PHONE** called W1's phone for approximately 3 minutes.[10] The phone contact is

---

[9] W1 also advised agents that on June 17, 2023, W1 was pulled over in Sandoval County and spent three days in jail for driving with a revoked license.

[10] Verizon Wireless does not retain historical text message data beyond one-year.

11

consistent with what W1 described during his interview. Toll records for **MENDEZ PHONE** from April 25, 2022, do not show any calls from W1 to **MENDEZ PHONE** on that day.

31.    Agents reviewed Ricardo MENDEZ's phone records which revealed the following calls between **MENDEZ PHONE** and **MONTANO PHONE** around the time of W1's arrest and W1's meeting with Ricardo MENDEZ.

    a.  April 22, 2022, at 10:29 a.m. (1 minute)

    b.  April 22, 2022, at 10:33 a.m. (9 minutes)

    c.  April 25, 2022, at 1:02 p.m. (8 minutes)

    d.  April 25, 2022, at 2:45 p.m. (2 minutes)

    e.  April 26, 2022, at 7:51 p.m. (1 minute)

    f.  April 27, 2022, at 10:32 a.m. (4 minutes)

    g.  April 27, 2022, at 10:51 a.m. (4 minutes)

    h.  April 27, 2022, at 12:35 p.m. (4 minutes)

    i.  April 27, 2022, at 3:06 p.m. (1 minute)

## IV.    The September 2023 arrest of CW1 by Joshua MONTANO

32.    On or about September 1, 2023, the FBI received an allegation from a now-cooperating witness, hereinafter referred to as Cooperating Witness #1 (CW1).[11] CW1 has been interviewed multiple times by the FBI.[12] Below is a summary of the information the FBI has gathered from CW1:

33.    On the night of August 25, 2023, and into the morning of August 26, 2023, CW1 was driving and ran out of gas near the intersection of Coors Boulevard and Montano Road in Albuquerque, New Mexico. Two APD vehicles approached CW1's car. Joshua MONTANO was one of the officers. The second officer was not identified. Joshua MONTANO interviewed CW1. CW1 admitted to drinking alcohol. Joshua MONTANO performed a field sobriety test on CW1. Joshua MONTANO then arrested CW1 and transported CW1 to an APD substation for a breathalyzer test.

34.    At the substation, CW1 was given a breathalyzer examination. Joshua MONTANO told CW1 that if CW1 did not blow twice the legal limit, CW1 would not go to jail. Joshua MONTANO said twice the limit would be an aggravated DWI. CW1's breathalyzer results were

---

[11] CW1 is considered reliable because information provided by CW1 was corroborated through review of documents, review of text messages, and consensually recorded telephone calls. CW1 was promised no favorable treatment or service from the United States Government.

[12] CW1 was provided with a "target letter" which allowed CW1 to obtain appointment of counsel through the Federal Court. CW1 conferred with his attorney and has agreed to continue cooperating with the government.

13

0.13 and 0.14. CW1 received a ticket and paperwork for DWI. Joshua MONTANO drove CW1 home. CW1's driver's license was kept by APD.

35.    On or about August 28, 2023, CW1 was contacted by Ricardo MENDEZ. At the time, CW1 understood Ricardo MENDEZ to be affiliated in some way with the public defender's office. Ricardo MENDEZ requested to meet with CW1 at a Freddy's Frozen Custard & Steakburgers (Freddy's) located in the vicinity of Coors Boulevard and Central Avenue in Albuquerque, New Mexico. CW1 agreed to the meeting.

36.    Later that day, on or about August 28, 2023, CW1 met with Ricardo MENDEZ at Freddy's. Prior to the meeting, Ricardo MENDEZ used **MENDEZ PHONE** to communicate via Short Message Service (SMS) with CW1 concerning what vehicle CW1 would be arriving in.[13] Below are the messages between CW1 and Ricardo MENDEZ:

> **RM:**  What are you driving
>
> **CW1:** I'm almost there I'm in a blue 2020 Volvo
>
> **CW1:** I'm here
>
> **RM:**  B there in a bit
>
> **CW1:** *[ok hand emoji]*
>
> **RM:**  Just pulled up

---

[13] CW1 provided consent for FBI agents to take photographs of text messages between CW1 and **MENDEZ PHONE**.

**RM:** Little wagon

**RM:** ?

**CW1:** Yes

37.     At some point during the meeting, Ricardo MENDEZ produced CW1's driver's license. Ricardo MENDEZ told CW1 that he could make CW1's the charges go away, and would return CW1's driver's license, if CW1 paid Ricardo MENDEZ $6,000. Ricardo MENDEZ emphasized he would not return CW1's driver's license until CW1 paid Ricardo MENDEZ. CW1 asked Ricardo MENDEZ how specifically Ricardo MENDEZ would make the charges go away. Ricardo MENDEZ said CW1 had until Wednesday, August 30, 2023, to pay the $6,000. Ricardo MENDEZ explained that he would normally give someone in CW1's position until a Friday to pay, but because it was Labor Day week, CW1 would have to pay by Wednesday.

38.     After meeting with Ricardo MENDEZ, CW1 described the interaction with Ricardo MENDEZ to a friend. CW1 and the friend both agreed the situation was weird. The two subsequently called Ricardo MENDEZ and attempted unsuccessfully to record the conversation. During the phone call, Ricardo MENDEZ told CW1 that the $6,000 payment had to be in cash.

39.     CW1 began cooperating with the FBI on or about September 1, 2023. CW1 described being motivated to work with the FBI out of a desire to see justice served.

15

40.      On or about September 5, 2023, at approximately 1:35 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using **MENDEZ PHONE**). Below is a transcription of the call:

**CW1:** Hi this is [CW1]. You know I'm I've been real worried about this ticket. And all this sh- crap going on. Is this am I still able to give you some money for it or what?

**RM:** Uh so remind me what ticket it was. I'm sorry.

**CW1:** It was uh [CW1]. It was um for the ticket that I got on last Saturday. The 27th. 26th.

**RM:** What was the ticket for though?

**CW1:** DWI

**RM:** Ok

**CW1:** We met at Freddy's

**RM:** Oh. Yeah man that all went up.

**CW1:** That all went up?

**RM:** It's- yeah.

**CW1:** Ok.

**RM:** You remember I told you to call me because I was leaving out of town Thursday at my desk. And I got back this morning at 3:30

**CW1:** Ok so there's nothing we can do then.

**RM:** Oh I can still I can still help you but as far as uh I mean they're gonna file. You could've beat it you know before it went before it got filed.

**CW1:** Oh ok.

16

**RM:** I mean we can still beat it but you're gonna wind up paying more now.

**CW1:** Oh I'm gonna end up being paying more now? Uh what do you mean? What do you mean?

**RM:** Well it wasn't filed. Nothing had been filed.

**CW1:** Ok

**RM:** I mean let me find out. I I like I said I took and I haven't been back. I got back this morning.

**CW1:** Ok

**RM:** Um I'll call you back.

**CW1:** Ok

41.     Based on my training and experience, I believe it is unusual for a defense attorney's employee to tell a potential client, "You could've beat it you know before it went before it got filed." I believe that is unusual because a private attorney's employee has no authority to control whether criminal charges are filed or not filed against someone. I also believe it would be unusual for a private law firm's employee to guarantee a favorable outcome for a potential client.

42.     A review of telephone toll data for **MENDEZ PHONE** revealed that on or about September 5, 2023, at approximately 1:40 p.m. - which was almost immediately after the conclusion of the above telephone call - **MENDEZ PHONE** made a telephone call to **MONTANO PHONE** which lasted approximately 47 seconds. In my training and experience, it also seems unusual that a defense attorney's employee would immediately contact the arresting

17

officer after the employee spoke with a potential client who was arrested by the officer. Taken together, I believe that when Ricardo MENDEZ said to CW1, "You could've beat it you know before it went before it got filed," Ricardo MENDEZ was telling CW1 that CW1's payment of money would have prevented criminal charges from being filed against CW1. In my training and experience, there would not be a lawful basis where payment to a defense attorney employee would prevent the filing of criminal charges. When Ricardo MENDEZ said, "I mean we can still beat it but you're gonna wind up paying more now," I believe Ricardo MENDEZ was telling CW1 that Ricardo MENDEZ could still arrange for the charges to be dismissed, but because the charges had been filed, CW1 would now have to pay more.

43.    On or about September 5, 2023, at approximately 2:04 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (on **MENDEZ PHONE**). Below is a transcription of the call:

**CW1:** Hey Ricardo.

**RM:** I'll find out for you uh tonight or tomorrow.

**CW1:** You'll find out for me tonight or tomorrow?

**RM:** Yeah

**CW1:** Ok

**RM:** So were you ready to that or what?

**CW1:** So I can come up with some of the money. I came up with 36. Um

18

**RM:**   Yeah no.

**CW1:**  How much. How much-

**RM:**   I told you

**CW1:**  Can I can you some?

**RM:**   All of it up front

**CW1:**  Um 6,000?

**RM:**   Mmhmm

**CW1:**  Ok. Ok um let me see what I can do then

**RM:**   See yeah that's what we talked about last week

**CW1:**  Ok

**RM:**   So if eh. Are you gonna be able to do that because I'm can't tell him to uh hold-

**CW1:**  Yes

**RM:**   Yeah because I don't want to be responsible for that money

**CW1:**  Yeah. So how would I get it to you?

**RM:**   Uh uh are you gonna be able to get that money?

**CW1:**  Yes. Yes.

**RM:**   Like tonight? Tomorrow morning?

**CW1:**  Tomorrow morning. That way-

**RM:**   Hello?

**CW1:**  That way I can get ahold of my um my uncle and he can give me the rest of the money.

19

**RM:** Yeah but that's what you told me last week

**CW1:** Well yeah that's cause he was out of town just like you were out of town for Labor Day

**RM:** Yeah let me know tonight cause I'm gonna I'm gonna ask him to do something if you can't do it

**CW1:** Ok. Ok so I'll let you know tonight.

**RM:** Alright.

**CW1:** Ok.

44.     When Ricardo MENDEZ asked CW1, "Are you gonna be able to do that because I'm can't tell him to uh hold-," I believe Ricardo MENDEZ was indicating that the payment of money by CW1 would allow Ricardo MENDEZ to ask Joshua MONTANO to not file the criminal charges against CW1. In my training and experience, there would be no lawful basis for such an arrangement. When Ricardo MENDEZ told CW1, "I'm gonna ask him to do something if you can't do it," I believe that Ricardo MENDEZ was saying that Joshua MONTANO would file the criminal charges if CW1 did not pay the money.

45.     A review of telephone toll data for **MENDEZ PHONE** revealed that on or about September 5, 2023, beginning at approximately 2:07 p.m. – which was minutes after the conclusion of the above telephone call – and continuing until approximately 5:17 p.m., **MENDEZ PHONE** communicated via SMS text message with **MONTANO PHONE** approximately six (6) times. The timing of these text messages in relation to the previous telephone call between Ricardo

MENDEZ and CW1, when viewed in combination with the fact that Joshua MONTANO was the arresting officer in the matter being discussed above, lead me to believe that Ricardo MENDEZ and Joshua MONTANO were communicating about the scheme to have CW1 pay money in exchange for CW1's criminal charges not being filed.

46.     On or about September 5, 2023, at approximately 5:49 PM, CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using **MENDEZ PHONE**). Below is a transcription of the call:

**CW1:** Hey Ricardo.

**RM:** Yes sir.

**CW1:** Yeah this is [CW1] again.

**RM:** Yes.

**CW1:** Um so um. I believe I'm going to be able to get all the money. Um so if I'm gonna give you this the six thousand…how how am I going to be sure this is just gonna go away.

**RM:** What ha- what has what has happened since when I met you.

**CW1:** Uh nothing so far.

**RM:** Exactly.

**CW1:** Ok. Alright. Alright so if um…so I I'm I'll be able to get most of the money um is there any way that I can um get you's most of the money and then I can give you the rest by Friday. Cause I just want to make sure this is gonna go away. And I'm I'm I'm like um

**RM:** You're playing with fire.

21

**CW1:** I'm sorry?

**RM:** I said you're playing with fire. Be careful. Um uh uh it's not in my control

**CW1:** Ok. It's out of your contr- ok.

**RM:** Yeah. Uh I mean I I held it off.

**CW1:** Ok.

**RM:** But uh you know if it go it it's not in my control.

**CW1:** Alright.

**RM:** As I told you I mean if you If you have friends or family or anybody that could help.

**CW1:** Yeah that's what I'm…I've got most of the money but they a lot of them are still coming into town and I'm trying to get more money in and I I can get most of it in

**RM:** How much is most of it?

**CW1:** Most of it is like 3600 right now.

**RM:** Eh

**CW1:** I got that. I'm gonna get more. I'm just waiting for it to come in.

**RM:** Yeah that's not on me sir.

**CW1:** What was that?

**RM:** I said it's not on me.

**CW1:** It's not.

**RM:** Keep keep me uh posted uh uh I'll call and let them know.

**CW1:** Ok.

22

**RM:**   Alright. Mm bye.

**CW1:**   Mm.

47.      In this call, CW1 asked, "how am I going to be sure this is just gonna go away." In response, Ricardo MENDEZ said, "what has what has happened since when I met you." When CW1 said "nothing," Ricardo MENDEZ responded by saying, "Exactly." In my training and experience, I believe that Ricardo MENDEZ was indicating to CW1 that CW1's relationship with Ricardo MENDEZ was the reason that criminal charges had not yet been filed against CW1. When Ricardo MENDEZ later told CW1 that "You're playing with fire," I believe Ricardo MENDEZ was telling CW1 that if the full amount of money was not paid by CW1, then CW1 was at risk of the criminal charges being filed. When Ricardo MENDEZ said, "Yeah. Uh I mean I I held it off," I believe that Ricardo MENDEZ was confirming for CW1 that Ricardo MENDEZ was the reason that criminal charges had not been filed against CW1. In my training and experience, there is no legitimate reason that a defense attorney's employee would have authority to "hold off" criminal charges for a potential client.

48.      On or about September 5, 2023, at approximately 6:25 p.m.,[14] CW1 sent a text message to **MENDEZ PHONE** which read, "Hello, this is [CW1] any updates." A review of telephone toll data for **MENDEZ PHONE** revealed that minutes later, between approximately

---

[14] Photograph of text message sent by CW1 indicates the text message was sent at approximately 6:25 p.m., however, subpoenaed toll records reflect an approximate time of 5:25 p.m.

6:27 p.m. and 6:32 p.m., **MENDEZ PHONE** communicated with **MONTANO PHONE** via SMS text message approximately three (3) times. The timing of these text messages in relation to the previous telephone call between Ricardo MENDEZ and CW1, when viewed in combination with the fact that Joshua MONTANO was the arresting officer in the matter being discussed above, indicates to me that Ricardo MENDEZ and Joshua MONTANO were likely continuing to communicate about the scheme to have CW1 pay money in exchange for CW1' criminal charge not being filed.

49.     A review of telephone toll data for **MENDEZ PHONE** revealed that on or about September 5, 2023, at approximately 6:27 p.m. – which was less than an hour after the above-described telephone call and two minutes after the above-described text messages – **MENDEZ PHONE** communicated via SMS text message with **MONTANO PHONE** approximately five (5) times. While it is unknown what was discussed, the timing of these text messages in relation to the previous telephone call between Ricardo MENDEZ and CW1, when viewed in combination with the fact that Joshua MONTANO was the arresting officer in the matter being discussed above, lead me to believe that Ricardo MENDEZ and Joshua MONTANO were using both **MENDEZ PHONE** and **MONTANO PHONE** to continue their communications about the scheme to have CW1 pay money in exchange for CW1' criminal charge not being filed.

24

50.     On or about September 6, 2023, at approximately 12:33 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using **MENDEZ PHONE**). Below is a transcription of the call:

**CW1:** Hello Ricardo.

**RM:** Yes.

**CW1:** Hi this is [CW1] again. Wondering if you heard anything back. If the money that I have will work until F- I get more money or cause I need to get this fixed.

**RM:** Now you weren't able to raise the money?

**CW1:** Um I've got about 38. I almost have it all.

**RM:** Um uh you know what let me try calling again and I'll call you back.

**CW1:** Ok.

51.     A review of telephone toll data for **MENDEZ PHONE** revealed that later that day, on or about September 6, 2023, at approximately 3:55 p.m., **MENDEZ PHONE** communicated via SMS text message with **MONTANO PHONE** approximately one (1) time. Later that same day, at approximately 4:50 p.m., **MENDEZ PHONE** made a telephone call to **MONTANO PHONE** that lasted approximately 398 seconds in duration.

52.     On or about September 7, 2023, at approximately 10:33 a.m., **MENDEZ PHONE** sent an SMS text message to **MONTANO PHONE**. Shortly thereafter, at approximately 11:37 a.m. **MENDEZ PHONE** made a telephone call to **MONTANO PHONE** that lasted

approximately 349 seconds. Then, between 11:02 a.m. and 11:33 a.m., **MENDEZ PHONE** communicated via SMS text message with **MONTANO PHONE** approximately eight (8) times.

53.    On or about September 7, 2023, at approximately 1:00 p.m., CW1 had a consensually recorded telephone call with Ricardo MENDEZ (using **MENDEZ PHONE**). Below is a transcription of the call:

**CW1:** Ricardo this is [CW1] I'm calling about the

**RM:** *Unintelligible (UI)*

**CW1:** Huh?

**RM:** Yes sir

**CW1:** I'm calling to see if we can get this settled. Um-

**RM:** Ok.

**CW1:** If I uh I think I can get all the money. I got all the money together. Um I just want to get this done. I can't sleep. I'm like freaking out because I'm afraid I'm gonna lose my job.

**RM:** Yeah. Yeah uh so you were able to do that now.

**CW1:** Yeah

**RM:** Alright um and you want to do it in the evening?

**CW1:** Sure

**RM:** Ok. Call um you after 5 after 6. Something like that.

**CW1:** Ok

**RM:** Alrighty then

**CW1:** Alright. Thanks.

54. A review of telephone toll data for **MENDEZ PHONE** revealed that on or about September 7, 2023, from approximately 4:04 p.m. to 4:21 p.m., **MENDEZ PHONE** communicated via SMS text message with **MONTANO PHONE** approximately two (2) times.

55. On or about September 7, 2023, beginning at approximately 4:59 p.m., CW1 communicated with Ricardo MENDEZ via SMS text messages sent and received from **MENDEZ PHONE**. Below are the text messages:

**CW1:** Hello this is [CW1] is still on.

**RM:** I'm still working Whenever I leave I will call you

**CW1:** Ok

**CW1:** Any idea on time I'm needing to pick up my mom from my sisters house?

**RM:** Do whatever you have to do I just got home & I'm waiting

**CW1:** Ok should it text when done?

**RM:** Are u ready?

**CW1:** Yes just got back

**RM:** I meant Do u have everything already?

**CW1:** yes I have the cash

**CW1:** ?

**RM:** hang tight

**CW1:** Ok

**RM:** I'm on the phone

27

**CW1:** Ok

**CW1:** Hey can we do this tomorrow I've been up early and I need to get to sleep early day tomorrow.

56. Between on or about September 7, 2023, and on or about September 9, 2023, CW1 and Ricardo MENDEZ attempted numerous times, unsuccessfully, to re-establish contact with one another. By way of example, on or about September 7, 2023, at approximately 8:54 p.m. and again at 8:58 p.m., **MENDEZ PHONE** attempted to call CW1 two times. The next morning, on or about September 8, 2023, at approximately 8:42 a.m., CW1 sent Ricardo MENDEZ a text message that read, "sorry, I didn't answer your phone call last night. I fell asleep." Your affiant is aware that September 9, 2023, was a Saturday.

57. Certain communications between the **MENDEZ PHONE** and the **MONTANO PHONE** during and after this time lead me to believe that Ricardo MENDEZ was likely telling Joshua MONTANO that the money was not going to be paid and to go ahead and file the charges against CW1:

   a. On or about September 7, 2023, **MENDEZ PHONE** sent two (2) text messages to **MONTANO PHONE** (one at approximately 8:54 p.m. and another at 8:58 p.m.). Later that same day, **MONTANO PHONE** sent one (1) text message to **MENDEZ PHONE** at 9:06 p.m.

   b. On or about September 7, 2023, **MENDEZ PHONE** called CW1 two (2) times (once at approximately 8:49 p.m. and a second time at approximately 8:51 p.m.).

28

Thereafter, at approximately 9:07 p.m., **MENDEZ PHONE** called **MONTANO PHONE**. The call lasted approximately 97 seconds.

c.       On or about September 8, 2023, **MENDEZ PHONE** and **MONTANO PHONE** spoke telephonically. The phone call lasted approximately 280 seconds.

d.       From on or about September 8, 2023, to on or about September 12, 2023, there were approximately 27 text messages between **MENDEZ PHONE** and **MONTANO PHONE** (including 16 text messages from **MONTANO PHONE** to **MENDEZ PHONE** and approximately 11 text messages from **MENDEZ PHONE** to **MONTANO PHONE**).

58.       On or about September 8, 2023, at approximately 8:42 a.m., CW1 communicated with Ricardo MENDEZ via SMS text messages sent to **MENDEZ PHONE**. Below are the text messages:

**CW1:** sorry, I didn't answer your phone call last night. I fell asleep

**CW1:** Can we get this done please. I am trying to get this go

59.       Court records shows that on Monday, September 11, 2023, a Criminal Complaint was filed against CW1. The Criminal Complaint showed the arresting officer as Joshua MONTANO and the basis of the Criminal Complaint was the traffic stop conducted of CW1 on August 26, 2023. Through my training and experience, and knowledge of the case, I believe that

29

when CW1 failed to pay the requested amount of money, that served as an impetus for Joshua MONTANO to file criminal charges against CW1.

60. On or about October 6, 2023, the FBI asked CW1 to re-establish contact with Ricardo MENDEZ. That same date, at approximately 3:36 p.m., CW1 sent two text messages via SMS to **MENDEZ PHONE**. Below are the text messages:

**CW1:** Hello I really need your help my date is coming up next week I drive a company truck I really can't lose my job I take care of my mother. Is there anyway we can take care of this still.

**CW1:** I've reached out for assistance and it's going to cost me the same if not more and not sure this will be gone and you promised for it to go away

61. Soon thereafter, on or about October 6, 2023, at approximately 6:25 p.m., **MENDEZ PHONE** called **MONTANO PHONE**. The phone call lasted approximately 134 seconds.

62. On or about October 10, 2023, **MENDEZ PHONE** replied to CW1. Beginning at approximately 8:22 p.m., CW1 communicated with **MENDEZ PHONE** via SMS text messages sent and received from **MENDEZ PHONE**. Below are the text messages:

**RM:** I'm available tomorrow afternoon I can text you after court

**CW1:** Hey just hoping you can still help me out my arraignment hearing is coming up and I'm freaking out

**RM:** I should be done by 2 or 230pm You shouldn't have procrastinated

**CW1:** I had the money anything we can do Sdo [sic] I call you tomorrow?

**RM:** I will reach out after court

30

**CW1:** Ok

63.　　Less than an hour later, on or about October 10, 2023, at approximately 8:31 p.m., **MENDEZ PHONE** sent a text message to **MONTANO PHONE**. Then, at approximately 9:02 p.m., **MONTANO PHONE** responded to the message, and at approximately 9:04 p.m., **MENDEZ PHONE** replied to **MONTANO PHONE**.

64.　　On or about October 11, 2023, CW1 communicated with **MENDEZ PHONE** via SMS text messages sent and received from **MENDEZ PHONE**. Below are the text messages:

**CW1:** I don't want to miss you call again because I'm at work

**CW1:** Sorry to bug

**RM:** 7112 aztec road ne 87110 Located in a residential area 415pm

65.　　On or about October 11, 2023, at approximately 4:15 p.m., CW1 had a consensually recorded meeting with Ricardo MENDEZ at the law office of Clear & Clear. Below is a partial transcript of the conversation between Ricardo MENDEZ and CW1:

**CW1:** I never got in trouble before. I started freaking out so bad that I, my, I need my job. I can't afford to l-to…

**RM:** So, this…(voices overlap)

**CW1:** …lose my license.

**RM:** …this, so it's a- it's already been filed.

**CW1:** Okay.

**RM:** It's already in the court system. And if you'd of done it when I told you too, it wouldn't have gone through the court system. None of this woulda happened.

31

**CW1:** Mmm hmm.

**RM:** It would've been done and over with. So, that's why I told you, we don't do any (UI) crime. We don't have to do anything, and I was gonna be (UI). Otherwise it was gonna be more. So… I you was saying you s- you saw a bunch of different attorneys. Not and I told you this when I met you, nobody's gonna be able to guarantee you could get rid of this. Uh, uh so having said that, I mean, what we charge for a DWI, when it comes in here is eighty five hundred. That's not, that's not a guarantee. You want a guarantee completely get out of it, it's gonna be ten grand. Or, or, or, or more, but… it, cause it's in the system now.

**CW1:** Yeah.

**RM:** …and you wouldn't, and you wouldn't of had anything, you would've had your license, would've been fine.

**CW1:** See man I was just a-I was just afraid because I didn't know how it was gonna work out. I didn't know if you were gonna ask for money b-more money later. Or what, what was going on.

**RM:** You sh-you should've looked us up. You would've seen that, dang this guy's legit.

**CW1:** Uh huh.

**RM:** I mean…it's a legitimate business. I mean this is all we do is criminal defense. So, now we're stuck like we're gonna have to do the whole case if you want us to do anything. Um but it's gonna cost you twice as much.

**CW1:** Shit.

**RM:** Now I'll, I'll, I'll work with you in payments, but it's the same thing. You're s-you're still gonna have to come up with a great majority upfront.

**CW1:** Mmm hmm. At least five thousand.

**RM:** No about say sixty five (UI, voices overlap)

**CW1:** About fifty five?

**RM:** And then I'll do the rest up in payments…

32

**CW1:** (UI).

**RM:** …for you. But the, you know, we've gotta have it paid off in three to four months.

**CW1:** Yeah. Shit.

**RM:** Same thing though…

**CW1:** Yeah.

**RM:** …it'll be completely off there.

**CW1:** It'll be completely off.

**RM:** It's just a slow process. You're gonna have, it's gonna have to take it's course. But, you won't have to worry about anything. The MVD hearing is set for next month.

**CW1:** It's set for, it's set for next month? Okay, cause I haven't received any paperwork, anything on that yet either.

**RM:** Yeah.

**CW1:** Okay.

**RM:** Well this is what I do.

**CW1:** Yeah.

**RM:** This is what I do all day long. I know uh where everything's, you know… what's going on.

**CW1:** Okay. Well let me work on getting the money together. I know I had already talked to my uncle, he still has that money saved for me. So let me talk with him and see what I can do. Because I'm like, like you said, I just wanna make sure that it's… I don't have to deal with it.

**RM:** Yeah. You won't have to. I mean but… you just, you just, you, you just shouldn't of waited.

33

**CW1:** Yeah, well I was, I, I, I was freaking out like I said and then I worked, like I say, I, I travel when I work, I drive, so I was out of town for a couple of weeks.

**RM:** (sighs) Yeah but it was over, almost two months ago.

**CW1:** Yeah. Shit.

**RM:** I mean y-you could go to any attorney in the state and nobody's gonna guarantee you off.

**CW1:** Mmm hmm.

**RM:** They can't.

**CW1:** Okay. And you can, you can guarantee?

**RM:** This is what we do.

**CW1:** Okay. Well let me see what, let me get my shit together…

**RM:** So tomorrow, what you're gonna have to do is you're gonna have to uh call in…

**CW1:** Uh huh.

**RM:** …and uh and just plead not guilty, and say give me, give me some time to get an attorney.

**CW1:** Okay.

**RM:** And, and they'll give you two weeks to get an attorney.

**CW1:** Okay.

**RM:** If you go try to get a public defender or get another attorney, there's, there, I know there's some cheap ones out there.

**CW1:** Yeah.

**RM:** You know there's, there's attorneys that are good and real cheap. I, I tell everybody the people who come to us are the ones that need to get off. You know what I mean?

34

If you don't need to get off, don't come to us. That's what those attorneys out there are for, you know, a few thousand, three or four thousand, they'll tell you maybe. Uh but if you need to get off, th-this is where you come.

**CW1:** And you can guarantee it? Okay. Okay. Alright, let me see what I can do then.

**RM:** Yeah and, and, and like I said if you do, if we roll this way, I'm gonna tell you to stop worrying.

**CW1:** Okay.

**RM:** Don't even think about this. It's done.

**CW1:** Okay. Okay.

**RM:** Yeah, tomorrow's no biggie. Tomorrow you call in and you say I'm pleading not guilty. They're gonna read-give the charges. The charge is DWI first offense. You're potentially facing up to ninety days in jail, one year r-revocation of your license, one year um uh probation, uh and uh forty eight hours community service, three hours of victim (UI) panel, um twelve hours of DWI school, um up to fifteen hundred dollars in fines and fees, um… and court costs, what else, let's see…

**CW1:** Damn, I don't have time for (laughs)…

**RM:** Yeah, that's, I mean…

**CW1:** Yeah.

**RM:** That's if you roll the dice.

**CW1:** Okay.

**RM:** But you don't need to roll the dice.

**CW1:** Yeah. Okay. Okay. So I'll make that phone call tomorrow and then um I'll uh start working on the rest of that money and then I'll get a hold of you. See what I can do.

35

**RM:**   And let's see what our schedule looks like tomorrow… (pause) So I should be done by three o'clock so uh you could call me or text me or, you know if you wanna just (UI) for tomorrow. Uh it's up to you.

**CW1:**   Let me, let me give you a call. Let me text you.

**RM:**   (speaks soft) Okay.

**CW1:**   Okay. Bueno. Shit. (UI) right to my friend's house.

**RM:**   What's that?

**CW1:**   (laughs) (UI) might be at my friend's house a little bit. (laughs)

**RM:**   Yeah, nobody lives here. This is just our office.

**CW1:**   Oh. Oh wow. Very nice. Okay. (background noise) Gracias, and I'll get a hold of you. Fuck, fuck, fuck, fuck. (background noise/bell sound/engine starts) (01:17) I'll be there on Monday, probably around… ten o'clock. If they wanna start, that's fine. If they can be there at ten o'clock, that would be great.

66.    When Ricardo MEDNEZ said, "And if you'd of done it when I told you too, it wouldn't have gone through the court system. None of this woulda happened," I believe Ricardo MENDEZ was telling CW1 that if CW1 had paid the money sooner, Ricardo MENDEZ could have prevented the criminal charges from being filed against CW1. When Ricardo MENDEZ said, "I mean, what we charge for a DWI, when it comes in here is eighty five hundred. That's not, that's not a guarantee. You want a guarantee completely get out of it, it's gonna be ten grand. Or, or, or, or more, but… it, cause it's in the system now," I believe Ricardo MENDEZ was telling CW1 that a higher price is charged for a "guarantee." In my training, experience, and knowledge of the investigation, I believe that Ricardo MENDEZ was using the word "guarantee" as a

36

shorthand way of telling CW1 that CW1's payment of money to Ricardo MENDEZ would assure a favorable outcome of CW1's charges based on an improper method.

67.    Ricardo MENDEZ told CW1, "you could go to any attorney in the state and nobody's gonna guarantee you off" and CW1 responded by asking, "And you can, you can guarantee?" Ricardo MENDEZ answering by saying, "This is what we do." In my training and experience, I believe it is unusual for a criminal defense attorney, or his employee, to guarantee a favorable outcome for a client. This is supported by Ricardo MENDEZ's statement that there is no other attorney in the state that could make such a promise. When taken together with the other information known, I believe that when Ricardo MENDEZ said, "This is what we do," I believe that Ricardo MENDEZ was confirming for CW1 that Ricardo MENDEZ had the ability to do something that other criminal defense law firms could not do, which was to use CW1's payment of money to assure that CW1's criminal charges were improperly dismissed.

68.    A review of telephone toll data for **MENDEZ PHONE** revealed that on or about October 11, 2023, at approximately 4:08 p.m. to 4:21 p.m., **MENDEZ PHONE** communicated via SMS text message with **MONTANO PHONE** approximately two (2) times. On or about October 11, 2023, at approximately 4:25 p.m. **MENDEZ PHONE** made a telephone call to **MONTANO PHONE** that lasted approximately 90 seconds. While it is unknown what was discussed, the timing of these text messages and subsequent phone call in relation to the consensually monitored meeting between Ricardo MENDEZ and CW1, when viewed in combination with the fact that Joshua MONTANO was the arresting officer in the matter being

37

discussed above, lead me to believe that Ricardo MENDEZ and Joshua MONTANO were using both **MENDEZ PHONE** and **MONTANO PHONE** to continue their communications about the scheme to have CW1 pay money in exchange for CW1's criminal charges being dismissed.

69.     Later that night, at approximately 11:22 p.m., CW1 sent a text message via SMS to **MENDEZ PHONE** that read, "That's a lot of moneys 100% guaranteeing  off , How ?" Ricardo MENDEZ did not respond to the message.

70.     On or about October 13, 2023, CW1 communicated with **MENDEZ PHONE**. via SMS text messages sent and received from **MENDEZ PHONE**. Below are the text messages:

**RM:**   Good morning We are available at 3pm today if you are ready

**CW1:**  Just want to make sure just like expressed in my last text.

71.     Ricardo MENDEZ did not respond to CW1's text message and agents have not had substantive communication with CW1 since that time because CW1 was appointed an attorney - at the government's request - to represent CW1. The government is in the process of finalizing the necessary approvals with CW1's appointed counsel to continue CW1's cooperation.

72.     Based on the foregoing information, I believe that probable cause exists to show to both **MENDEZ PHONE** and **MONTANO PHONE** have been used to facilitate violations of the TARGET OFFENSES.

38

## THE TARGET ACCOUNT

73.     In response to a subpoena requesting information pertaining to Apple accounts associated with Joshua MONTANO and **MONTANO PHONE**, Apple provided records dated October 27, 2023.

74.     According to those records, **MONTANO PHONE** is associated with an Apple account ending in 4970 that was created on December 30, 2010. The Apple ID for the associated account is jbm3893@yahoo.com (the **TARGET ACCOUNT**). **MONTANO PHONE** is listed as one of the Facetime/iMessage phones for the **TARGET ACCOUNT**, as well as one of the Verified Phones for the **TARGET ACCOUNT**. The address listed for the **TARGET ACCOUNT** is believed to the address of Joshua MONTANO's residence. The name on the **TARGET ACCOUNT** is Deverae Montano, which is known to be the name of Joshua MONTANO's wife. The records show that the account type for the **TARGET ACCOUNT** is "Full iCloud (iCloud+)." Based on the information above, and because Joshua MONTANO is the listed subscriber for **MONTANO PHONE**, agents believe the **TARGET ACCOUNT** is the iCloud account associated with **MONTANO PHONE**.

75.   In the records received from Apple related to the **TARGET ACCOUNT**, a backup of the **TARGET ACCOUNT** occurred as recently as October 16, 2023.[15] The records show the following iCloud features are used by the **TARGET ACCOUNT**:

| DSID | Apple ID | iCloud Feature | Feature Used |
|---|---|---|---|
| 159054970 | jbm3893@yahoo.com | iCloud Backup (iOS Devices)* | Yes |
| 159054970 | jbm3893@yahoo.com | Bookmarks* | Yes |
| 159054970 | jbm3893@yahoo.com | Calendars | Yes |
| 159054970 | jbm3893@yahoo.com | iCloud Photos* | Yes |
| 159054970 | jbm3893@yahoo.com | Contacts | Yes |
| 159054970 | jbm3893@yahoo.com | Find My Friends | Yes |
| 159054970 | jbm3893@yahoo.com | iCloud Drive* | Yes |
| 159054970 | jbm3893@yahoo.com | iCloud Reminders* | Yes |
| 159054970 | jbm3893@yahoo.com | Mail | Yes |
| 159054970 | jbm3893@yahoo.com | Mail Header | Yes |
| 159054970 | jbm3893@yahoo.com | Maps | No |
| 159054970 | jbm3893@yahoo.com | Messages in iCloud* | No |
| 159054970 | jbm3893@yahoo.com | Notes* | Yes |
| 159054970 | jbm3893@yahoo.com | Safari Browsing History | No |
| 159054970 | jbm3893@yahoo.com | Sign in with Apple | Yes |

It is noted that many of the features are enabled, including calendars, photos, contacts, notes, mail, and iCloud drive.

76.   The records show that "Messages in iCloud" is not a feature used. The "iCloud Backup (iOS Devices)" is feature is used, however. In its law enforcement guide, Apples states, "iOS device backups may include photos and videos in the Camera Roll, device settings, app data, iMessage, Business Chat, SMS, and MMS messages and voicemail." Apple Inc., *Legal Process*

---

[15] It is possible that additional backups may have occurred since that time, but the subpoena directed to Apple was dated October 16, 2023, so Apple did not produce records occurring after that date.

*Guidelines   –   Government   and   Law   Enforcement   within   the   United   States,* https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf (last visited October 31, 2023), at 13. Through the investigation, it has been learned that **MENDEZ PHONE** is an Android phone. I know through training and experience that Android phones use SMS and MMS messaging. Therefore, there is reason to believe that messages exchanged between **MONTANO PHONE** and **MENDEZ PHONE** may be saved in the iCloud Backup of the **TARGET ACCOUNT**.

77.   Based on the facts set forth in this affidavit, as noted above, there is probable cause to believe that Joshua MONTANO has committed the TARGET OFFENSES. There is also probable cause to believe that Joshua MONTANO has used **MONTANO PHONE**, which is linked to the **TARGET ACCOUNT**, in the commission of these offenses. There is therefore probable cause to believe that the **TARGET ACCOUNT** contains fruits, evidence, and instrumentalities of the TARGET OFFENSES.

78.   As described above, Joshua MONTANO appears to have used **MONTANO PHONE** to communicate with Ricardo MENDEZ numerous times relevant to the scheme under investigation. There is therefore probable cause to believe that data related to these communications is likely still stored on **TARGET ACCOUNT** in the form of call logs, telephone numbers, and identifiers for telephone numbers and instant messaging/social media accounts, detailing the users of the telephones Joshua MONTANO was in contact with. Based on my training and experience, there is also probable cause to believe that the content of the messaging

41

communications that occurred between **MONTANO PHONE** and **MENDEZ PHONE** will be stored in the **TARGET ACCOUNT** (Joshua MONTANO's iCloud account).

79.     In my training and experience, individuals who engage in criminal activity, including violations of 18 U.S.C. § 371 (conspiracy) and 18 U.S.C. § 1951 (Hobbs Act extortion under color of official right)., use devices like the Apple devices associated with Joshua MONTANO to (1) access websites to facilitate illegal activity and to communicate with co-conspirators online; and to (2) store documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators, email correspondence, text or other SMS messages, contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social media accounts, and records of illegal transactions, to, among other things, (a) keep track of co-conspirator's contact information; (b) keep a record of illegal transactions for future reference; (c) keep an accounting of illegal proceeds; and (d) store incriminating data for future exploitation.

80.     In my training and experience, individuals who engage in the foregoing criminal activity will often "back up" or transfer files from their devices to an outside server like the iCloud, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.  As a result, evidence of their crimes can be found in the contents of: email messages; instant messages; files and other records stored on iCloud, including address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks. Evidence of such individuals' criminal conduct can

also be found in records regarding the identification and establishment of the account, including the name, address, telephone, and email address associated with the account; records pertaining to the type of service used; records pertaining to the communications between Apple and any person regarding the account; records regarding where the account was accessed, including all data stored in connection with location services; and records regarding activity, connection, and transactional logs for the account. In my training and experience, evidence of who was using an Apple device and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above. This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

81.    Based on the information previously set forth in this affidavit, I submit there exists probable cause to believe that Joshua MONTANO utilized **MONTANO PHONE** to communicate about and/or facilitate the criminal conspiracy described above, and that evidence or instrumentalities of the criminal conspiracy in which he and others engaged will be located in the **TARGET ACCOUNT**.

82.    Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation. Any records of communications among the TARGET SUBJECTS would be relevant to establish the nature of their respective

43

relationships as well as their respective participation in the above-described scheme, all of which is relevant to their criminal conspiracy. Thus, the stored communications and files connected to his respective Apple ID may provide direct evidence of the offenses under investigation.

83. In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time. As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account. Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

84. Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation. For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

85.      In my training and experience, in some cases, account users will communicate directly with a service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users.  Providers typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

86.      Therefore, Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## BACKGROUND CONCERNING APPLE[16]

87.      Apple is a United States company that produces the iPhone, iPad, and iPod Touch, all of which use the iOS operating system, and desktop and laptop computers based on the Mac OS operating system.

---

[16] The information in this section is based on information published by Apple on its website, including, but not limited to, the following document and webpages: "U.S. Law Enforcement Legal Process Guidelines," available at https://www.apple.com/legal/privacy/law-enforcement-guidelines-us.pdf; "Manage and use your Apple ID," available at https://support.apple.com/en-us/HT203993; "iCloud," available at http://www.apple.com/icloud/; "Introduction to iCloud," available at https://support.apple.com/kb/PH26502; "What does iCloud back up?," available at

88.    Apple provides a variety of services that can be accessed from Apple devices or, in some cases, other devices via web browsers or mobile and desktop applications ("apps").  As described in further detail below, the services include email, instant messaging, and file storage:

a.    Apple provides email service to its users through email addresses at the domain names mac.com, me.com, and icloud.com.

b.    iMessage and FaceTime allow users of Apple devices to communicate in real-time.  iMessage enables users of Apple devices to exchange instant messages ("iMessages") containing text, photos, videos, locations, and contacts, while FaceTime enables those users to conduct audio and video calls.

c.    iCloud is a cloud storage and cloud computing service from Apple that allows its users to interact with Apple's servers to utilize iCloud-connected services to create, store, access, share, and synchronize data on Apple devices or via icloud.com on any Internet-connected device.  For example, iCloud Mail enables a user to access Apple-provided email accounts on multiple Apple devices and on iCloud.com.  iCloud Photo Library and My Photo Stream can be used to store and manage images and videos taken from Apple devices, and iCloud Photo Sharing allows the user to share those images and videos with other Apple subscribers. iCloud Drive can be used to store presentations, spreadsheets, and other documents.  iCloud Tabs

https://support.apple.com/kb/PH12519;    and    "Apple    Platform    Security,"    available    at https://help.apple.com/pdf/security/en_US/apple-platform-security-guide.pdf.

and bookmarks enable iCloud to be used to synchronize bookmarks and webpages opened in the Safari web browsers on all of the user's Apple devices. iCloud Backup allows users to create a backup of their device data. iWork Apps, a suite of productivity apps (Pages, Numbers, Keynote, and Notes), enables iCloud to be used to create, store, and share documents, spreadsheets, and presentations. iCloud Keychain enables a user to keep website username and passwords, credit card information, and Wi-Fi network information synchronized across multiple Apple devices.

        d.      Game Center, Apple's social gaming network, allows users of Apple devices to play and share games with each other.

        e.      Find My iPhone allows owners of Apple devices to remotely identify and track the location of, display a message on, and wipe the contents of those devices. Find My Friends allows owners of Apple devices to share locations.

        f.      Location Services allows apps and websites to use information from cellular, Wi-Fi, Global Positioning System ("GPS") networks, and Bluetooth, to determine a user's approximate location.

        g.      App Store and iTunes Store are used to purchase and download digital content. iOS apps can be purchased and downloaded through App Store on iOS devices, or through iTunes Store on desktop and laptop computers running either Microsoft Windows or Mac OS. Additional digital content, including music, movies, and television shows, can be purchased through iTunes Store on iOS devices and on desktop and laptop computers running either Microsoft Windows or Mac OS.

89.    Apple services are accessed through the use of an "Apple ID," an account created during the setup of an Apple device or through the iTunes or iCloud services.  The account identifier for an Apple ID is an email address, provided by the user.  Users can submit an Apple-provided email address (often ending in @icloud.com, @me.com, or @mac.com) or an email address associated with a third-party email provider (such as Gmail, Yahoo, or Hotmail).  The Apple ID can be used to access most Apple services (including iCloud, iMessage, and FaceTime) only after the user accesses and responds to a "verification email" sent by Apple to that "primary" email address.  Additional email addresses ("alternate," "rescue," and "notification" email addresses) can also be associated with an Apple ID by the user.  A single Apple ID can be linked to multiple Apple services and devices, serving as a central authentication and syncing mechanism.

90.    Apple captures information associated with the creation and use of an Apple ID. During the creation of an Apple ID, the user must provide basic personal information including the user's full name, physical address, and telephone numbers.  The user may also provide means of payment for products offered by Apple.  The subscriber information and password associated with an Apple ID can be changed by the user through the "My Apple ID" and "iForgot" pages on Apple's website.  In addition, Apple captures the date on which the account was created, the length of service, records of log-in times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to and utilize the account, the Internet Protocol address ("IP address") used to register and access the account, and other log files that reflect usage of the account.

48

91.     Additional information is captured by Apple in connection with the use of an Apple ID to access certain services.  For example, Apple maintains connection logs with IP addresses that reflect a user's sign-on activity for Apple services such as iTunes Store and App Store, iCloud, Game Center, and the My Apple ID and iForgot pages on Apple's website.  Apple also maintains records reflecting a user's app purchases from App Store and iTunes Store, "call invitation logs" for FaceTime calls, "query logs" for iMessage, and "mail logs" for activity over an Apple-provided email account.  Records relating to the use of the Find My iPhone service, including connection logs and requests to remotely lock or erase a device, are also maintained by Apple.

92.     Apple also maintains information about the devices associated with an Apple ID. When a user activates or upgrades an iOS device, Apple captures and retains the user's IP address and identifiers such as the Integrated Circuit Card ID number ("ICCID"), which is the serial number of the device's SIM card.  Similarly, the telephone number of a user's iPhone is linked to an Apple ID when the user signs into FaceTime or iMessage.  Apple also may maintain records of other device identifiers, including the Media Access Control address ("MAC address"), the unique device identifier ("UDID"), and the serial number.  In addition, information about a user's computer is captured when iTunes is used on that computer to play content associated with an Apple ID, and information about a user's web browser may be captured when used to access services through icloud.com and apple.com.  Apple also retains records related to communications between users and Apple customer service, including communications regarding a particular Apple device or service, and the repair history for a device.

93.      Apple provides users with five gigabytes of free electronic space on iCloud, and users can purchase additional storage space.  That storage space, located on servers controlled by Apple, may contain data associated with the use of iCloud-connected services, including: email (iCloud Mail); images and videos (iCloud Photo Library, My Photo Stream, and iCloud Photo Sharing); documents, spreadsheets, presentations, and other files (iWork and iCloud Drive); and web browser settings and Wi-Fi network information (iCloud Tabs and iCloud Keychain).  iCloud can also be used to store iOS device backups, which can contain a user's photos and videos, iMessages, Short Message Service ("SMS") and Multimedia Messaging Service ("MMS") messages, voicemail messages, call history, contacts, calendar events, reminders, notes, app data and settings, Apple Watch backups, and other data.  Records and data associated with third-party apps may also be stored on iCloud; for example, the iOS app for WhatsApp, an instant messaging service, can be configured to regularly back up a user's instant messages on iCloud Drive.  Some of this data is stored on Apple's servers in an encrypted form but can nonetheless be decrypted by Apple.

94.      In my training and experience, evidence of who was using an Apple ID and from where, and evidence related to criminal activity of the kind described above, may be found in the files and records described above.  This evidence may establish the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion.

50

95.     For example, the stored communications and files connected to an Apple ID may provide direct evidence of the offenses under investigation.  Based on my training and experience, instant messages, emails, voicemails, photos, videos, and documents are often created and used in furtherance of criminal activity, including to communicate and facilitate the offenses under investigation.

96.     In addition, the user's account activity, logs, stored electronic communications, and other data retained by Apple can indicate who has used or controlled the account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, subscriber information, email and messaging logs, documents, and photos and videos (and the data associated with the foregoing, such as geo-location, date and time) may be evidence of who used or controlled the account at a relevant time.  As an example, because every device has unique hardware and software identifiers, and because every device that connects to the Internet must use an IP address, IP address and device identifier information can help to identify which computers or other devices were used to access the account.  Such information also allows investigators to understand the geographic and chronological context of access, use, and events relating to the crime under investigation.

97.     Account activity may also provide relevant insight into the account owner's state of mind as it relates to the offenses under investigation.  For example, information on the account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan

51

to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

98.    Other information connected to an Apple ID may lead to the discovery of additional evidence.  For example, the identification of apps downloaded from App Store and iTunes Store may reveal services used in furtherance of the crimes under investigation or services used to communicate with co-conspirators.  In addition, emails, instant messages, Internet activity, documents, and contact and calendar information can lead to the identification of co-conspirators and instrumentalities of the crimes under investigation.

99.    Apple's servers are likely to contain stored electronic communications and information concerning subscribers and their use of Apple's services.  In my training and experience, such information may constitute evidence of the crimes under investigation including information that can be used to identify the account's user or users.

## CONCLUSION

100.    Based on the forgoing, I request that the Court issue the proposed search warrant.

101.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.  The government will execute this warrant by serving the warrant on Apple.  Because the warrant will be served on Apple, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## REQUEST FOR SEALING

102.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

Respectfully submitted,

Andrew Waltz
Special Agent
Federal Bureau of Investigation

Subscribed and sworn telephonically and signed electronically on November 2, 2023

JOHN F. ROBBENHAAR
UNITED STATES MAGISTRATE JUDGE

53

## ATTACHMENT A

### Property to Be Searched

This warrant applies to information associated with jbm3893@yahoo.com (the **TARGET ACCOUNT**) that is stored at premises owned, maintained, controlled, or operated by Apple Inc., a company headquartered at One Apple Park Way, Cupertino, California.

## ATTACHMENT B

### Particular Things to be Seized

**I.      Information to be disclosed by Apple Inc. ("Apple")**

To the extent that the information described in Attachment A is within the possession, custody, or control of Apple, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, or information that has been deleted but is still available to Apple, or has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Apple is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers, email addresses (including primary, alternate, rescue, and notification email addresses, and verification information for each email address), the date on which the account was created, the length of service, the IP address used to register the account, account status, associated devices, methods of connecting, and means and source of payment (including any credit or bank account numbers);

b.      All records or other information regarding the devices associated with, or used in connection with, the account (including all current and past trusted or authorized iOS devices and computers, and any devices used to access Apple services), including serial numbers, Unique Device Identifiers ("UDID"), Advertising Identifiers ("IDFA"), Global Unique Identifiers ("GUID"), Media Access Control ("MAC") addresses, Integrated Circuit Card ID numbers ("ICCID"), Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifiers ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Numbers

("MSISDN"), International Mobile Subscriber Identities ("IMSI"), and International Mobile Station Equipment Identities ("IMEI");

c.　　The contents of all emails associated with the account from January 1, 2022 to Present, including stored or preserved copies of emails sent to and from the account (including all draft emails and deleted emails), the source and destination addresses associated with each email, the date and time at which each email was sent, the size and length of each email, and the true and accurate header information including the actual IP addresses of the sender and the recipient of the emails, and all attachments;

d.　　The contents of all instant messages associated with the account from January 1, 2022 to Present, including stored or preserved copies of instant messages (including iMessages, SMS messages, and MMS messages) sent to and from the account (including all draft and deleted messages), the source and destination account or phone number associated with each instant message, the date and time at which each instant message was sent, the size and length of each instant message, the actual IP addresses of the sender and the recipient of each instant message, and the media, if any, attached to each instant message;

e.　　The contents of all files and other records stored on iCloud, including all iOS device backups, all Apple and third-party app data, all files and other records related to iCloud Mail, iCloud Photo Sharing, My Photo Stream, iCloud Photo Library, iCloud Drive, iWork (including Pages, Numbers, Keynote, and Notes), iCloud Tabs and bookmarks, and iCloud Keychain, and all address books, contact and buddy lists, notes, reminders, calendar entries, images, videos, voicemails, device settings, and bookmarks;

f.　　All activity, connection, and transactional logs for the account (with associated IP addresses including source port numbers), including FaceTime call invitation logs, messaging and

2

query logs (including iMessage, SMS, and MMS messages), mail logs, iCloud logs, iTunes Store and App Store logs (including purchases, downloads, and updates of Apple and third-party apps), My Apple ID and iForgot logs, sign-on logs for all Apple services, Game Center logs, Find My iPhone and Find My Friends logs, logs associated with web-based access of Apple services (including all associated identifiers), and logs associated with iOS device purchase, activation, and upgrades;

g.      All records and information regarding locations where the account or devices associated with the account were accessed, including all data stored in connection with Location Services, Find My iPhone, Find My Friends, and Apple Maps;

h.      All records pertaining to the types of service used;

i.      All records pertaining to communications between Apple and any person regarding the account, including contacts with support services and records of actions taken; and

j.      All files, keys, or other information necessary to decrypt any data produced in an encrypted form, when available to Apple (including, but not limited to, the keybag.txt and fileinfolist.txt files).

Apple is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

II.    **Information to be seized by the government**

All information described above in Section I that constitutes fruits, contraband, evidence, and instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy) and 18 U.S.C. § 1951 (Hobbs Act extortion under color of official right) as described in the search warrant affidavit, including, but not limited to the following:

a)  Information that constitutes evidence of the identification or location of the user(s) of the account;

b)  Information that constitutes evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts;

c)  Information that constitutes evidence indicating the state of mind of Joshua MONTANO and Ricardo MENDEZ, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, related to the criminal activity under investigation;

d)  Information that constitutes evidence concerning how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crime under investigation and to the user of the account;

e)  The content of communications that constitutes evidence of the criminal activity under investigation, including communications by and between Joshua MONTANO and Ricardo MENDEZ, and by and between Joshua MONTANO and any other coconspirators or accomplices;

f)  Steps taken in furtherance of the criminal activity under investigation;

4

g) Evidence indicating in any way a motive to commit any the offenses detailed in this affidavit, or to otherwise engage in criminal activity;

h) Identification of coconspirators, accomplices, and aiders and abettors in the commission of the above offenses.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant.  The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

5